UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

97 OCT 30 ID 1:53

U.: ...:::ICT COURT
N.D. OF ALABAMA

UNITED STATES OF AMERICA, )
for the use and benefit of )
M & W EQUIPMENT CO., INC., )
)
    Plaintiff, )
)
vs. )   Civil Action No. CV-96-8-1860-NE
)
INTERNATIONAL, INC. and )
FRONTIER INSURANCE COMPANY, )
)
    Defendants. )
)

**ENTERED**

OCT 3 1 1997

### MEMORANDUM OPINION

This is a Miller Act[1] claim growing out of contracts for the removal of underground waste oil storage tanks, and the installation of aboveground storage tanks, at Buildings 504, 501, 400, 55, and 4 on the Anniston Army Depot. The action is before the court following a bench trial. Upon consideration of the pleadings, testimony, exhibits, stipulations, and arguments of counsel, this court makes findings of fact and enters conclusions of law.

Defendant International, Inc. was awarded the prime contract for performance of the subject work by the United States Army Corps of Engineers on or about November 18, 1994. (Plaintiff's Exhibit 4.) International was to be paid $558,201, provided it commenced work within eight calendar days following receipt of formal notice to proceed, and, completed the project within 180 calendar days.

> The Contractor shall be required to (1) commence work under this contract within 8 calendar days after the date the Contractor receives the notice to proceed, (2) prosecute the work diligently, and (3) complete the entire work ready for use not later than 180 calendar days after receipt of notice to proceed.

---

[1] 40 U.S.C. §§ 270 et seq.



(Plaintiff's Exhibit 4, Section 1A, Special Clauses, SC-3.)   If
International failed to do so, the compensation payable was to be
reduced by the amount of $254 for each day of delay.

> If the Contractor fails to complete the work within the
> time specified in the contract, or any extension, the
> Contractor shall pay to the Government as liquidated
> damages, the sum of $254.00 for each day of delay.

(Plaintiff's Exhibit 4, Section 1A, Special Clauses, SC-4.)

On January 6, 1995, International executed a subcontract with
M & W Equipment Co., Inc. for the removal, decontamination, and
disposal of underground storage tanks, associated piping, ancillary
equipment, and, for the installation of above-ground and under-
ground waste oil storage tanks.   For such work, International
agreed to pay M & W $252,000.   (Plaintiff's Exhibit 5.)   By an
addendum to the subcontract (modifying among other provisions
paragraph 24, requiring M & W to "furnish and pay for a performance
and payment bond"), International agreed to pay M & W the addi-
tional amount of $1,500 in partial reimbursement for the cost of
acquiring such bond.[2]   Thus, the total  original compensation due
M & W under the subcontract was $253,500.   To date, M & W has been
paid only $155,000.

During the course of work, the Corps of Engineers and
International amended the scope of the prime contract in several
respects.[3]   The requirement that the contractor dispose of contami-

---

[2] See Plaintiff's Exhibit 5 at 11, stating:   "ITEM 24 of Contract:
Contractor will pay subcontractor $1,500.00 for Payment and Performance Bond."

[3] Although these changes to the prime contract were formally reduced to
writing only after the close of the contract, i.e., on February 21, 1996, all
parties were aware the changes would be made before the referenced work was
performed.   See Plaintiff's Exhibit 62 at 2.

2

nated soil surrounding any of the underground waste oil storage tanks was deleted.    International had allocated $43,860 for performance of that work in its bidding schedule. (See Plaintiff's Exhibit 17 at 3.)   Hence, the compensation due International as prime contractor was reduced by that same amount.    On the other hand, the Corps of Engineers added a new item of work to the contractor's responsibilities (i.e., loading an estimated 285 cubic yards of decontaminated soil into rolloff containers), for which the Corps agreed to pay International $6.05 for each cubic yard loaded (285 x $6.05 = $1,724.25). The net effect of these two changes was a decrease in compensation due the prime contractor in the amount of $42,135.75.   (Plaintiff's Exhibit 74.)   Responsibil- ity for the work affected by those changes fell to M & W under its subcontract with International, however.   Accordingly, Interna- tional deducted the same amount of $42,135.75 from the compensation due M & W under its subcontract.

M & W contended at trial that the amount deducted improperly included International's markup of M & W's bid for this work.   M & W estimated the proper deduction at approximately $25,000.   M & W did not, however, submit an itemized bid reflecting any specific amount for the soil disposal work.    (Compare International's itemized bid [Plaintiff's Exhibit 4 at 5] to M & W's bid, contain- ing no line items [Plaintiff's Exhibit 5 at 6-10].)   Moreover, this court has been unable to find convincing evidence from among the 118 exhibits admitted that support M & W's $25,000 estimate.   Thus, even though this court is inclined to adopt M & W's argument, in

3

the absence of any reliable evidence establishing the specific amount plaintiff bid for the disposal of contaminated soil, the court is compelled to find that International's deduction of the full amount was proper.

The Corps of Engineers issued a formal notice to proceed on February 3, 1995, and Onel Tucker, president of International, acknowledged receipt on February 6, 1995. (Plaintiff's Exhibit 12.) Thus, under the prime contract, the project was due to be completed no later than August 5, 1995. (Plaintiff's Exhibit 82.) Instead, it was 162 days late. The project was not deemed complete by the Corps of Engineers until January 25, 1996.

The purpose of the Miller Act is to protect subcontractors and suppliers who provide labor and material for a federal project, because federally owned lands or buildings are exempt from the mechanics' and materialmen's liens that normally secure such parties' rights under state law. *United States f/u/b/o Sherman v. Carter*, 353 U.S. 210, 216, 77 S. Ct. 793, 797, 1 L. Ed. 2d 776 (1957). To effectuate this intent, the Miller Act is liberally construed. *F. D. Rich Co., Inc. v. United States f/u/b/o Industrial Lumber Co., Inc.*, 417 U.S. 116, 124, 94 S. Ct. 2157, 2162, 40 L. Ed. 2d 703 (1974). Although a liberal construction does not mean that the Act establishes an unlimited basis for recovery, a prime contractor and his surety are liable for any "sum or sums justly due" a subcontractor for labor or material furnished in the performance of its agreement to work on the public project. *See United States f/u/b/o Pertun Construction Co. v. Harvester's Group*,

4

*Inc.*, 918 F.2d 915 (11th Cir. 1990); 40 U.S.C. § 270b(a).

Hence, the central dispute in the present case is whether M & W has been fully paid for its work. If International properly offset all damages for delay against the amount owed to M & W (based on its assessment that M & W was solely responsible for all of the delay), then M & W may have been overpaid. If International's offset was improper in whole or in part, however, then M & W is entitled to recover those "sums justly due." That determination requires consideration of the reasons the project was delayed, and, the party responsible.

At the outset, it is appropriate to note that this court is convinced neither party performed its work in a timely and workmanlike manner. Testimony from Gary Stokes, Assistant Resident Engineer with the Corps of Engineers with oversight for this project, establishes that both parties share blame for delay. The court thus begins its analysis with that premise in mind.

A two prong inquiry follows. First, the court must analyze the cause of the delays and allocate responsibility therefor. Second, the court must determine precisely what damages were assessed by the Corps against International.

**I.   Responsibility for Delays**

   **A.   The Submittal Process**

The Corps of Engineers requires contractors to submit documentation showing that all work, material and equipment which will be used in performing the project complies fully with the specifications expressed in the engineering drawings and contract

5

documents. Gaining approval of such submittals is the ultimate
responsibility of the prime contractor, although subcontractors are
responsible for providing relevant technical data on materials and
components they intend to install.  The prime collates the
information and presents it to the Corps for review.  If rejected,
a revised submittal must be provided.  This give-and-take continues
until the Corps formally executes an approval.  It not only is
common practice, but prudent for contractors to wait until
submittals have been formally approved before purchasing materials.
Otherwise, a contractor could wind up with materials that the Corps
will not permit for use in the project.  Clearly, therefore, the
submittal process requires communication and cooperation between
the prime and subcontractors.  Both commodities were in short
supply on this job.[4]

     The parties agree that the submittal process took longer than
expected (or than it should have) and caused some delay in the
early months of the project; they disagree on the reasons for the
slow process.  Unfortunately, the documentary evidence, although
voluminous, does not include complete records of the submittals.
Indeed, plaintiff has not provided any reliable, accurate evidence
of the dates on which it provided submittal data to International.[5]

_____

[4] In the words of the character portrayed by Strother Martin in the movie
"Cool Hand Luke" (Warner Brothers 1967):  "What we have here is, a failure to
communicate.  Some men you just can't reach."

[5] On direct questioning by the court, Doug Maze, account manager for M &
W, stated that he had no documents of any kind (including a cover letter) which
would firmly establish the dates on which his company first provided submittal
information to International.  Testimony established that an official submittal
register was kept by the Corps, but it either was not sought during discovery or
not offered in evidence.  Two letters which appear to establish that M & W sent
some product data to International before April 11, 1995 are discussed *infra*.

6

The admitted evidence reflects that two submittals made by International—one on January 20th and another on the 24th of that same month—were approved by the Corps in March, 1995. (*See* Plaintiff's Exhibits 15 and 19 at 2.[6]) M & W apparently had no responsibility to provide information contained in those submittals, however.[7]

On April 11, 1995, Doug Maze of M & W wrote to International regarding "Transmittal #6."[8] (Plaintiff's Exhibit 20.) The letter appears to be an attempt by M & W to clarify ten items included in an earlier submittal. It is not clear whether those clarifications were made at the behest of the Corps or International, but the letter is directed to International and does not mention the Corps. Moreover, Winston Wilson, International's job superintendent responsible for preparing many of the submittals, testified that the clarifications were made at his request, because the original information provided by M & W was inadequate and could not be submitted to the Corps. On the other hand, plaintiff asserts the clarifications were part of the normal give-and-take of the submittal process.

---

[6] Plaintiff's Exhibit 19 at 1 references Transmittal No. 002A, but it is unclear from this exhibit when No. 002A was submitted or approved by the Corps. Plaintiff's Exhibit 110 includes a copy of Transmittal No. 002A, which references construction progress charts. This document is dated June 6, 1995, and M & W appears to have had no hand in its preparation.

[7] No evidence was presented which would establish that M & W had any responsibility for preparing those submittals, which dealt with the project safety plan and activity hazard analysis.

[8] Although the documents relating to work and product specifications are called "submittals," the record includes only transmittals on which some of the submittals are recorded. In the absence of the Corps' formal submittal register, the court treats the transmittals as evidence of the dates on which submittals were presented to the Corps.

7

On April 19, 1995, M & W again wrote to International regarding submittals, this time providing more information on fiberglass pipe. (Plaintiff's Exhibit 21.) Yet again, however, the court cannot ascertain from the evidence presented whether the letter is a revision of an earlier submittal, or is the first submittal of that information.[9] On April 21, 1995, Onel Tucker wrote M & W that he approved the submittals for the fiberglass pipe, fittings, and tanks, and urged M & W to "proceed to man the job with sufficient material and personnel immediately." (Plaintiff's Exhibit 23.[10])

A May 10, 1995, letter from M & W to International indicates that the Corps approved M & W's submittals on May 4, 1995. (Plaintiff's Exhibit 26.) The only convincing evidence that M & W submitted any information to International earlier than April is this letter, which states: "We have received today, 5-4-95, approval of the material submitted Feb 95."[11] This suggests that, at a minimum, M & W supplied some submittal information to International during February of 1995. Nevertheless, it does not establish that M & W supplied all of the required information in February, or that the information supplied was adequate. As noted

---

[9] The last line of the letter states: "Please find additional submittal referring to military spec info." Because no record of that "additional submittal" is included in any exhibit, the court once again is left without precise dates on which to base its findings regarding delay. Plaintiff's failure to present evidence on this crucial point mirrors the pattern of sloppiness that pervaded the project at issue.

[10] Although the Corps had apparently not yet approved the pipe, Tucker's letter and testimony indicate that, to speed up the project, he was willing to assume the risk that the pipe might ultimately be rejected by the Corps. M & W rejected his offer.

[11] The letter is dated May 10, 1995, yet refers to receiving the Corps' approval "today, 5-4-95."

8

earlier, International's job superintendent, who prepared submit-
tals from information supplied by M & W, testified that M & W's
initial submissions merely were unmarked pages torn from supplier
catalogs.  Those had to be revised before International was willing
to forward them to the Corps.[12]

Final responsibility for presenting submittals unquestionably
rested with the prime contractor.  Nevertheless, M & W subcon-
tracted to perform a significant portion of this contract, and one
important aspect of M & W's performance under that subcontract was
to provide product information to International in a timely manner
so that it could be submitted to the Corps for approval.  The court
finds that M & W failed to discharge that responsibility, thus
causing delays in the purchase and delivery of materials essential
to the work it was to perform.

### B.   Manning the Job

M & W employees first reported for work on May 15, 1995, 100
days after the Corps issued a notice to proceed.  M & W contends it
was not notified in writing that it could commence work until Onel
Tucker's April 21, 1995 letter,[13] but the court finds this claim
without merit.  M & W knew, or should have known, the timeframe in
which the contract was to be completed.  International did nothing
to prevent M & W from commencing work.  No written notice from
International should have been necessary.

M & W's employee work reports reveal that two M & W employees

---

[12] Superintendent Wilson testified that M & W's initial submittals provided
no indication of which products on each page were to be used.  At his request,
M & W highlighted the pertinent products and information.

[13] See text at note 10 *supra*.

9

worked on May 15 for only half the day. One or two M & W workers showed up later that week, then two employees worked for one full week. Between May 30 and July 5, 1995, however, M & W employees worked only one day for a total of 21 hours.[14] Thus, plaintiff's own work records reflect that, even after approval of submittals and delivery of material, M & W employees did only one full day's work during the month of June. Substantial, daily work did not begin until July 13, when several employees began working consistently, including some overtime. This was only 23 days before the project was due to be completed, however.

Stated differently, when M & W employees finally reported to the Anniston Army Depot on May 15, 1995, only 83 calendar days remained between then and August 5, 1995: the scheduled completion date. As shown in Appendix A *infra*, however, M & W employees worked only 26 days during that span, or less than one-third (31.31%) of the period remaining for completion of the project.

Indeed, most of the effort devoted to this project by M & W occurred after the scheduled completion date. As shown in Appendix A, between August 6, 1995 and January 16, 1996 (the last date on which any M & W employee performed work at the Depot),[15] plaintiff's laborers worked 55 days, or 67.9% of the total number of days (81) devoted to the project by M & W.

Although plaintiff produced some evidence that International

---

[14] This work, by two employees, occurred on June 20. *See* Plaintiff's Exhibit 115 at 11.

[15] M & W work reports reveal that three additional hours of work were performed at the Depot on March 14, 1996, but these hours are not included in the payroll records admitted into evidence.

also caused delays in the project's completion,[16] no credible evidence established that International inhibited M & W from doing its job after May 15. Even if International was dilatory in forwarding submittals to the Corps, those delays do not explain why M & W did not commit substantial man-hours to the project until only 23 days before the completion deadline. The contract allowed 180 days of work. M & W began its work too late to meet that deadline.

### C.  The Subcontract

Close reading of the subcontract between International and M & W reveals that the subcontract expressly incorporated the requirements of the prime contract, and M & W agreed to a hold harmless clause which protects International from damages caused by M & W. Paragraph Five states:

> The work to be performed and/or material to be furnished by SUBCONTRACTOR, as set forth and described in Article 32 and the Prime Contract shall include doing any and all things necessary for, or incidental to, accomplishing or completing the performance of all items shown in Article 32 in strict compliance with all of the terms, conditions, and specifications of the Prime Contract. ... SUBCONTRACTOR expressly agrees and binds itself to save and hold harmless CONTRACTOR ... from and against any losses or damages or every kind which may be sustained, or suffered by [CONTRACTOR] on account of the failure of SUBCONTRACTOR to perform all obligations assumed by it under the terms of this agreement.

---

[16] Gary Stokes testified that, in his opinion, International's management of the project was "weak." He also attributed most of the delays to International, because they did not work as many Fridays as M & W, and also because International performed unsatisfactory electrical work, causing delays in M & W's work. The court notes, however, that Stokes was not responsible for daily job site inspections until October, 1995, when this job already was more than two months late, and that Stokes admitted he had no knowledge of the terms of the subcontract between International and M & W, which is discussed *infra*. Working on Fridays would not have been necessary at all if the work had begun on time and progressed steadily during the spring and early summer.

11

(Plaintiff's Exhibit 5 at 2, ¶ 5.)  Moreover, the subcontract makes clear that M & W was aware that

> time is of the essence in the performance of the things herein subcontracted ... and that all work to be per-formed ... by SUBCONTRACTOR shall be completed within such time as will permit completion of the Prime Contract by the CONTRACTOR within the contract time limit...; and any failure on the part of SUBCONTRACTOR to complete the operations herein sublet to it within the time as set forth above shall entitle CONTRACTOR to recover all losses and damages which may result to it from such delay.

(*Id.* ¶ 6(a).)  The subcontract also permits International to enforce "in full" the liquidated damages provision of the prime contract against M & W.  (*Id.* ¶ 7.)

Although the subcontract permits the prime contractor to grant extensions of time to subcontractors for delays caused by the prime, such claims must be made in writing within 48 hours of the delay.  (*Id.* ¶ 8.)  No written claims blaming International for delay were made by M & W at any time during the course of perform-ing this subcontract.  The only documented claims that Interna-tional caused delays were made <u>after</u> the completion of the contract.  Because plaintiff did not make its claims of delay in writing within 48 hours, it arguably is contractually barred from asserting such claims against International now.  Several facts convince the court, however, that fault for delay should be shared.

First, the prime contractor is ultimately responsible for scheduling the work of the subcontractor, and International did not adequately manage the project.  Gary Stokes' testimony supports

12

this conclusion, as do his contemporaneous records.[17]

Additionally, a letter from Stokes to International dated November 1, 1995 reveals that, even at this late date, International was apparently not taking the missed deadline seriously:

> As of today, you are 87 days behind your original completion date of 5 August 1995. During this time you have made no effort to mitigate this delay, either by increasing your work schedule or by adding to your work force. Your lack of effort in completion of this contract work is clearly a failure on the part of your management and is deemed unacceptable to this office.

(Plaintiff's Exhibit 51.)

Moreover, some of the electrical work performed by International did not comply with the pertinent code and contract provisions, eliciting the following notice from the Corps:

> A recent detailed inspection of the electrical work performed by your personnel revealed numerous products and practices in noncompliance with the National Electrical Code and contract requirements. As this work is not being performed by a qualified electrician as required by contract documents a final inspection and acceptance will not be made until this office is provided a written certification provided by a qualified electrician that states that all products installed and work performed has been inspected and is in strict accordance with the National Electrical Code and contract requirements.

(Id.)[18]

Such evidence establishes that both parties shared responsibility for the delays that plagued this project. In considering

---

[17] Stokes' evaluation of International's performance, set out in Plaintiff's Exhibit 86 at 2-3, deems their work "marginal," largely on the basis of "weak" management.

[18] In the close of this letter, Stokes directed International to provide a detailed schedule for completing the contract work. The schedule was not forthcoming, and, in a followup letter on November 16, 1995, Stokes suspended further payments on the contract unless the requested schedule was in his hands within 5 days. The record does not reflect when, or if, such a schedule was produced and submitted to the Corps. See Plaintiff's Exhibit 55.

13

how much blame to assess each party, the court notes trial testimony by Onel Tucker that 60 percent was a "fair estimate" for the portion of the work called for in the prime contract which was performed by M & W.   The court also credits a February 1, 1996 letter to M & W regarding payment on the subcontract, in which Tucker assesses only 70 percent of the damages for delay against M & W, effectively conceding International's responsibility for 30 percent of the delay.  (Plaintiff's Exhibit 71.)[19]   The court finds this ratio reflective of the relative fault of the parties in causing the delays, and hereby adopts it for application in this case.

## II.   The Cost of Delay

The original contract amount due International was $558,201. That amount was decreased by $42,135.75 pursuant to two changes made by the Corps in the scope of work.[20]   A further reduction of $4,470 was made at the close of the contract following quantity adjustments.    (Plaintiff's Exhibit 113.)    The final payment document prepared by the Corps of Engineers reflects that liquidated damages for 60 days of delay, or $15,240, was assessed against International.    (Plaintiff's Exhibit 86 at 2.)    Thus, International was due, and in fact was paid, $496,355.25 upon completion of its contract.  This amount is derived as follows:

---

[19] Tucker cites the "Total Amount Retained by C.O.E." as $74,394, then assesses 70 percent of that amount, or $52,075, against the amount owed to M & W.   Although the ratio is deemed reasonable, the court does not find record support for these figures.  The court's analysis of the actual damages assessed by the Corps is set forth *infra*.

[20] *See* Plaintiff's Exhibit 74; *see also* discussion at pages 2-4 *supra*.

14

| | |
|---|---|
| Original Contract Amount | $558,201.00 |
| Less Soil Revision Change Order (net) | -42,135.75 |
| Less Quantity Adjustment Change Order | -4,470.00 |
| Less Liquidated Damages (60 days x $254) | -15,240.00 |
| Net Amount Paid | $496,355.25 |

Although International was only assessed liquidated damages for 60 days of delay, the contract clearly was 162 days late. Indeed, in a June 13, 1996 letter to International, Gary Stokes states that "the contract was deemed substantially complete 162 days past the original completion date." (Plaintiff's Exhibit 97.) During negotiations with International, however, the Corps agreed to not assess liquidated damages for 102 days in exchange for International's withdrawal of several claims for additional compensation. (*Id.*) At trial, Stokes denied that International's claims were traded for liquidated damages, but his letter makes clear that such an exchange took place:

> The contractor had two claims for costs related to trenching work in building 504. These claims cumulatively represented $17,220.29 and 32 days extension in contract time. It was the position of the government that these claims were without merit. However, in order to assure timely fiscal close-out of this contract the government agreed to decrease liquidated damages by 70 days if the contractor would drop these and all other claims associated with this contract. The contractor felt he was due administrative costs associated with deletion of the Bid Item associated with soil disposal. It was discussed and agreed that 23 days of liquidated damages would be dropped in association with this work. The contractor further requested time associated with completion of the remaining punchlist items. It was agreed that should the contractor complete all punchlist items within 7 days, liquidated damages would only be assessed for 60 calendar days.

(Id.)   Based on that letter, the court finds that International

15

traded claims for additional work valued at $17,220.29[21] and $5,842[22] for elimination of 93 days of liquidated damages.[23]   Accordingly, those sums represent compensation due to International, but for the delays in completing the contract.  Such damages for delay are due to be assessed against M & W in proportion to its fault as discussed above.   Thus, International is entitled to offset the sums due to M & W by the total of liquidated damages assessed against International plus claims for additional work traded for a reduction in liquidated damages.  This amount equals $38,302.29,[24] of which 70 percent, or $26,811.60,[25] is attributable to M & W.

The amount due M & W under its original contract with International was $253,500.[26]  This amount was properly reduced by $42,135.75 for the soil revision change order and $4,470 for quantity adjustments, yielding a final price under the subcontract of $206,894.25. (Plaintiff's Exhibit 74.)  Plaintiff has been paid $155,00 to date, leaving a balance of $51,894.25.  Deducting M & W's share of the liquidated damages and offsets for delay results in "sums justly due" to M & W in the amount of $25,082.65.

### III. Prejudgment Interest

[21] Although 70 days of liquidated damages equals $17,780, the court adopts International's own valuation of the work it traded for those days.

[22] This figure is derived as follows:  23 days at $254 each = $5,842.

[23] The remaining 9 days of liquidated damages were attributed to bad weather and were not assessed against International.

[24] This total is derived as follows:

| Claims for Additional Trenching Work | $17,220.29 |
|---|---|
| Claim for Additional Administrative Work | 5,842.00 |
| Liquidated Damages (60 days) | +15,240.00 |
| | $38,302.89 |

[25] 70% x $38,302.29 = $26,811.60.

[26] See discussion supra Section I.

16

Plaintiff seeks an award of prejudgment interest. Under the Miller Act, the allowance (or denial) of prejudgment interest is an issue of federal law. *United States f/u/b/o Seminole Sheet Metal Co., v. SCI, Inc.*, 828 F.2d 671, 677 (11th Cir. 1987). The Act provides no explicit standards for resolving the issue, however. Accordingly, the Act is "treated as incorporating state law on this issue." *SCI, Inc.*, 828 F.2d at 678.

Under Alabama law, prejudgment interest is proper only if the damages are certain, or capable of being made certain. *Braswell v. Conagra*, 936 F.2d 1169 (11th Cir. 1991) (applying Alabama law). Such interest, if awarded, is payable at a rate of six percent per annum. *See* Alabama Code § 8-8-1; *see also* Alabama Code § 8-8-8 (stating such interest is appropriate in a contract action from the date payment was due). An amount due on unpaid invoices for an open account, however, is not certain until a trial court enters final judgment. *Benetton, S.p.a., v. Benedot, Inc.*, 642 So. 2d 394 (Ala. 1994) (citing *Healthcare Authority v. Madison County*, 601 So. 2d 459 (Ala. 1992)). "[D]amages that 'are not yet reduced to a certainty in respect of amount, nothing more being established than the plaintiff's right to recover; or such [damages] as cannot be fixed by a mere mathematical calculation from ascertained data in the case,'" are unliquidated damages and, thus, *uncertain*. *Benetton*, 642 So. 2d at 403 (quoting Black's Law Dictionary, 393 (6th ed. 1990)).

The record herein establishes that the amount due M & W was uncertain. M & W's Miller Act claim rests entirely on invoices

17

submitted to International, but not paid.  Moreover, both parties
made claims for additional work performed due to the other's delays
and inadequacies.  There was dispute as to the amount of liquidated
damages assessed against International, and as to the amount of
those damages attributable to delays caused by M & W.  There was
dispute as to whether work performed by both parties complied with
electrical codes and contract requirements.  There was dispute as
to which work was included within M & W's subcontract, and how much
of that work was affected by the soil revision change order.  On a
review of the record, the court finds that the amount due M & W was
not certain and, therefore, prejudgment interest is not warranted
under Alabama Code § 8-8-8.

M & W, however, bases its claim for interest on the Timely
Payments to Contractors and Subcontractors Act,[27] which provides in
pertinent part:

>  (b)  When a subcontractor has performed pursuant to his
> or her contract and submits an application or pay request
> or an invoice for materials to a contractor in sufficient
> time to allow the contractor to include the application,
> request, or invoice in his or her own pay request
> submitted to an owner, the contractor shall timely pay to
> the subcontractor in accordance with the payment terms
> agreed to by the contractor and subcontractor....
>
> ...
>
> (d)  If the ... contractor ... does not make payment in
> compliance with this chapter, the ... contractor ...
> shall be obligated to pay his or her ... subcontractor
> ... interest at the rate of one percent per month (12%
> per annum) on the unpaid balance due.

Alabama Code § 8-29-3(b).  The statute provides an exception for
sums withheld pursuant to a bona fide dispute over any of the

---

[27] Alabama Code § 8-29-3(b).

18

following:

    (1)   Unsatisfactory job progress.
    (2)   Defective construction not remedied.
    (3)   Disputed work.

...

    (5)   Failure of the contractor ... to make timely
payments for labor, equipment, and materials.

Alabama Code § 8-29-4(a). Items 1-3 and 5 all apply to this case.
The statute permits a contractor to withhold payment for a *bona
fide* dispute "in an amount not to exceed 2 times the disputed
amount" so long as the contractor provides written notice to the
subcontractor within 5 days of the disputed request for payment.
*Id.* at 4(b) and (c).

International notified M & W of disputes as to its work and
invoices repeatedly throughout this contract. (*See, e.g.,*
Plaintiff's Exhibits 23, 33-36, and 49.) M & W had notice of *bona
fide* disputes as early as June 6, 1995, when it first began
asserting its rights under the Miller Act and disputing Interna-
tional's refusal to pay certain of its invoices. (*See, e.g.,*
Plaintiff's Exhibits 28 and 40.) The court finds that a *bona fide*
dispute existed as to the sums due to M & W, and International
complied with the notice requirements under Alabama Code § 8-29-
4(c). Accordingly, prejudgment interest is not proper under the
Timely Payments to Contractors and Subcontractors Act.

**IV. Attorney Fees**

M & W asserts its right to recover a reasonable attorney's fee
pursuant to Paragraph 26 of the subcontract, as amended, or in the
alternative, pursuant to Alabama Code § 8-29-3, the Timely Payments

19

to Contractors and Subcontractors Act. (Plaintiff's Exhibit 5 at 4 and 11.) "The so-called 'American Rule' governing the award of attorneys' fees in litigation in the federal courts is that attorneys' fees 'are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.'" *F.D. Rich Co., Inc., v. United States f/u/b/o Industrial Lumber Co., Inc.*, 417 U.S. 116, 126, 94 S. Ct. 2157, 2163, 40 L. Ed. 2d 703 (1974) (quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717, 87 S. Ct. 1404, 1407, 18 L. Ed. 2d 475 (1967)). Hence, no attorney's fee is due to be awarded under the Miller Act, unless the underlying contract provides for it, or a state law requires it.

Section 26 of the subcontract states:

> Should CONTRACTOR employ an attorney to enforce any of the provisions hereof, or to protect its interest in any matter arising under this contract, or to collect damages for the breach of this contract, or to recover on the surety bond given by SUBCONTRACTOR under this contract, SUBCONTRACTOR and his surety, jointly and severally agrees to pay CONTRACTOR all reasonable costs, charges, expenses, and attorney's fees expended or incurred therein.

(Plaintiff's Exhibit 5 at 4.) A similar provision included in an addendum to the subcontract states:

> Should Contractor employ an attorney to enforce any of the provisions hereof, or to protect its interest in any matter arising under this contract, or to collect damages for the breach of this contract, Contractor agrees to pay subcontractor all reasonable costs, charges, expenses, and attorney's fees expended or incurred therein.

(Plaintiff's Exhibit 5 at 4.)[28]  Doug Maze testified that the word

---

[28] Both parties signed this addendum, printed on International stationery, on January 6, 1995.

20

"Contractor" in the first line of this provision is a typographical error committed by the defendant, who typed Maze's handwritten draft. The phrase, "Contractor agrees to pay subcontractor" in the fourth line supports Maze's testimony, as does common sense. Unless "Contractor" is a typographical error, the provision suggests that the plaintiff pursued an addendum to its contract for the protection of International, rather than M & W. Considering that International was already protected by Paragraph 26 of the subcontract, this interpretation seems unlikely. The court finds that M & W is entitled to an attorney's fee of one third its recovery.[29] That amount equals $8,360.88.

## IV. CONCLUSION

For the foregoing reasons, the court finds in favor of the plaintiff. A judgment consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _30th_ day of October, 1997.

_____
United States District Judge

---

[29] The parties stipulated at trial that a one third contingency fee is reasonable in this case.

21

## APPENDIX A

## GRAPHIC DEPICTION OF LABOR PERFORMED BY M & W EQUIPMENT CO. BETWEEN MAY 15, 1995 AND JANUARY 25, 1996

```
                    LEGEND
      ① = One man working half day
      ② = Two men working half day
      ❶ = One man working full day
      ❷ = Two men working full day
      + = overtime work (amount varies)
```

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| **May 1995** | | | | | | |
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 ③ | 16 | 17 ❶ | 18 ❷ | 19 | 20 |
| 21 | 22 ❷ | 23 ❷ | 24 ❷ | 25 ❷ | 26 ❷ | 27 |
| 28 | 29 | 30 ❷+ | 31 | | | |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| **June 1995** | | | | | | |
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 ❷ | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| **July 1995** | | | | | | 1 |
| 2 | 3 | 4 | 5 ❷ | 6 ❶ | 7 ❶ | 8 |
| 9 | 10 | 11 | 12 | 13 ❶② | 14 ❶+ | 15 |
| 16 | 17 ❶+ | 18 ❶+ | 19 ❶+ | 20 ❷+ | 21 | 22 |
| 23 | 24 ❷+ | 25 ❷+ | 26 ❷+ | 27 ❷ | 28 ❷ | 29 |
| 30 | 31 | | | | | |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| **August 1995** | | | | | | |
|  |  | 1 ❷ | 2 | 3 | 4 ❷ | 5 |
| 6 | 7 ❷+ | 8 ❷+ | 9 ❷+ | 10 ❷+ | 11 ① | 12 |
| 13 | 14 ❶+ | 15 ❶ | 16 ❷+ | 17 ❷+ | 18 ❷+ | 19 |
| 20 | 21 ① | 22 ❶ | 23 ❶ | 24 ❶ | 25 ❷+ | 26 |
| 27 | 28 ❷ | 29 ❷+ | 30 ❷+ | 31 ❷+ | | |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| September 1995 | | | | | | |
| | | | | | 1 ● | 2 |
| 3 | 4 | 5 ●+ | 6 ●+ | 7 ●+ | 8 ●+ | 9 |
| 10 | 11 ●+ | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 ●+ | 19 ●+ | 20 | 21 | 22 | 23 |
| 24 | 25 ● | 26 ● | 27 ● | 28 ● | 29 | 30 |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| October 1995 | | | | | | |
| 1 ● | 2 ● | 3 ● | 4 ● | 5 ● | 6 ● | 7 |
| 8 | 9 | 10 ● | 11 ● | 12 | 13 ● | 14 |
| 15 | 16 ● | 17 ● | 18 ● | 19 ● | 20 ● | 21 |
| 22 | 23 ● | 24 ● | 25 ● | 26 ● | 27 | 28 |
| 29 | 30 ● | 31 ● | | | | |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| November 1995 | | | | | | |
| | | | 1 ● | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 ● | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 ●+ | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| December 1995 | | | | | | |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 ● | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| January 1996 | | | | | | |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 ● | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |